DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from an Athens County Common Pleas Court, Juvenile Division, judgment that awarded Athens County Children Services (ACCS) permanent custody of General H. West, Jr., born September 27, 2004.
 {¶ 2} Appellant Anna Anderson, the child's natural mother, raises the following assignments of error for review:
First Assignment of Error:
"The guardian ad litem's failure to make an independent investigation of the facts and circumstances involved was prejudicial to the substantive and procedural due process rights of appellant."
Second Assignment of Error:
"The trial court erred by granting children services' request for permanent custody in the absence of reasonable efforts by the agency, denying appellant substantive due process rights to the care, custody and control of her child."
 {¶ 3} On September 27, 2004, appellant gave birth to General H. West, Jr. On September 28, 2004, ACCS filed a complaint that alleged the child to be neglected and dependent and requested permanent custody. ACCS alleged that: (1) appellant had her parental rights involuntarily and permanently terminated with respect to two other children; (2) appellant "is allegedly using drugs and alcohol"; (3) appellant is living with General West, Sr. (West), the child's father, and his mother, Sharon Rutter, both of whom have a long history with ACCS; (4) West has been named as a perpetrator in five separate sexual abuse cases from 1993 to December of 2002, one of those being sexual abuse against one of his biological children; and (5) ACCS provided "Help Me Grow" services to appellant, but she refused the service.
 {¶ 4} On September 28, 2004 the court placed the child in ACCS's custody by emergency ex parte order. On September 30, 2004 the court found that ACCS was not required to use reasonable efforts to reunify the child with the mother.
 {¶ 5} On October 28, 2004, the guardian ad litem filed her report. In it, she reported that appellant lives with West, Rutter, and West's step-father, Ted Rutter, who "is a known pedophile." The guardian ad litem asserted that appellant did not receive prenatal care, did not attend child care classes, and is a heavy smoker. The guardian ad litem alleged that appellant's IQ "is borderline to mild deficit range" and "[i]t would be difficult for her to make the right decisions for her child." The uardian ad litem believed that Rutter's home would be too small for four adults and a child.
 {¶ 6} The guardian ad litem further noted that "[t]here are allegations on record that [West] sexually abused his sister Dawn's children. Tonya West, [West's] ex-wife stated that [West] admitted to her that he sexually abused his niece and nephews. Both [appellant] and [West] come from very dysfunctional families." The guardian ad litem recommended that the court award ACCS permanent custody.
 {¶ 7} On October 29, 2004 the court held an adjudication hearing. At the hearing, a few items in the guardian ad litem's report were shown to be incorrect. First, appellant did not live with West's step-father, the "known pedophile." Instead, the step-father had passed away before the guardian ad litem filed her report. Second, the record showed that appellant had received prenatal care.
 {¶ 8} At the hearing, twenty-four year old Rebecca Yocum testified that when she was about twelve years old, West played with her "private part" and tried to make her suck and touch his penis. Twenty-two year old Patricia Eblin testified that in 1999 West forced her to have sex.
 {¶ 9} Tonya West testified that she formerly was married to West and has a son, Ryan (born June 28, 2000), who is West's child. She stated that West last visited Ryan in November of 2002. Tonya explained that when West had extended visits with Ryan, he returned Ryan to Tonya looking "horrible." "He would be in a dirty diaper when he would come back. His clothes would be filthy. It looked like they just took my son and rolled him in dirt." Tonya further stated that upon returning from West's care, Ryan would be awake half the night with nightmares, and "he would start putting stuff up his rectum."
 {¶ 10} Lonnie Tyler stated that he has custody of appellant's seven year old child, Olivia. Tyler stated that although appellant is allowed to visit, she has visited just once in a two-year period.
 {¶ 11} ACCS caseworker Liesl Gyurko testified that when ACCS removed appellant's other two children, the concerns were neglect, parenting skills, cleanliness, and the children's developmental delays. She stated that appellant participated in parenting classes, but the classes did not help. ACCS assigned appellant a homemaker but her progress was inconsistent. Gyurko explained that the one child, Steven, had smoke allergies and ACCS requested appellant and her husband, David Anderson, to not smoke in the home. They did not listen, however. Gyurko stated that appellant could not maintain a home sanitary and free from smoke for Steven's health. She testified that appellant "does not appear able to comprehend parenting knowledge and put the tools into place in her home with her children."
 {¶ 12} Marilyn Neason, the guardian ad litem, testified that she observed the four-room home where appellant and West currently live. She did not believe that the home contained enough room for the child and she did not observe any preparations for the baby, including a crib.
 {¶ 13} ACCS caseworker Mandy Reuter observed appellant's and West's visits with the newborn. Reuter did not believe that either appellant or West had the ability to read the baby's cues and understand his needs.
 {¶ 14} On November 17, 2004, the trial court adjudicated the child dependent. In reaching its decision, the court stated: (1) "Mother has now given birth to four children and permanently and involuntarily lost custody of the middle two * * * * Her oldest child is in the legal custody of a relative"; (2) "Neither parent is employed, nor have they ever been in any meaningful way. Father receives SSI and mother receives disability assistance while appealing her denial of eligibility for SSI. A previous SSI recipient, she was subsequently advised that she was employable. Rather than seek employment, mother is simply appealing the denial"; (3) "These parents have no stable housing and are temporarily living with [West's] mother, Sharon Rutter. While there is concern about the space available and cleanliness in this house, the real issue is the overall environment. [West's mother] also receives social security disability because of what she describes as `crippling arthritis' and `schooling' (presumably, the lack thereof). At a minimum we know that Mrs. Rutter cannot read or write."
 {¶ 15} The court further found:
"[Appellant] receives temporary disability assistance of $115.00 per month and $100.00 in food sta[mp]s. She freely admits that she smokes thirty-six cigarettes a day even though she was offered, but declined, participation in a smoking cessation program. She pays $30.00 a month toward the cable bill and helps pay some of the pawn shop bills incurred by [West]. [West] was asked how he spent his days, to which he replied, `I sit at home and play on the Play Station II.' Some days he also rides his bicycle. He pays his mother $50.00 to $100.00 a month for rent and has a $140.00 payment left on his Play Station or the games that it operates.
The couple's announced intention is to move this baby in with them in Sharon Rutter's home. ACCS has a long history of involvement with Mrs. Rutter and many of her children while they were in her custody. [Appellant, West, and Mrs. Rutter] would be this baby's primary caretakers. [Appellant] has permanently lost custody of two children as a result of neglect and dependency. Other than the difference of which man she's currently with, she has done nothing to change. [West] states that he will not bath[e] or even hold a baby because he has `weak arms.' The best the parents can do regarding independent housing is to say they are on a waiting list for HUD assistance."
 {¶ 16} On December 22, 2004 the court held a dispositional hearing. At the hearing, Neason stated that she reviewed ACCS's records, met appellant and West, visited their home, and visited the newborn and his foster family. After completing her investigation, she recommended that the court award ACCS permanent custody.
 {¶ 17} The child's foster mother, Krista Sigman, stated that she observed the child interact with the parents during visits. She noticed that the child did not react as much to appellant's or West's voice as he did to her voice. Sigman testified that the child is well integrated into her family.
 {¶ 18} Reuter testified that appellant and West identified Sharon Rutter and Angela West as relative placements. However, ACCS did not find either to be an appropriate placement. Reuter stated that reunification would be futile based on appellant's and West's family's past history with ACCS. She stated that: (1) appellant and West do not have adequate housing or income; (2) neither has successful parenting experience; (3) ACCS permanently removed two of appellant's children; (4) West failed to maintain contact with his son, Ryan; and (5) neither parent can provide a safe, stable, and permanent home.
 {¶ 19} Reuter testified that during visits with the baby, neither appellant nor West demonstrated adequate parenting skills. She testified that appellant was not able to follow the foster parent's instructions for preparing the child's bottle for feeding. Reuter stated that she did not observe any bond between appellant and the child. Reuter stated that the child appears bonded to the foster mother and that the foster mother's two other children, ages four and six, interact well with the baby.
 {¶ 20} On January 24, 2005, the trial court awarded ACCS permanent custody. The court found that permanent custody would serve the child's best interests. In evaluating the best interest factors, the court stated: (1) "Other than supervised visits at ACCS, this child has no interaction with the biological parents. Any siblings or half-siblings live elsewhere than with this mother and father. Two of [appellant's] children have been permanently involuntarily removed from her. This child is doing well with the foster family"; (2) "The child is a newborn and his wishes are unknown and unobtainable"; (3) "By history, this child has been in the temporary custody of ACCS and placed in foster care since birth (9-27-04)"; (4) "This child needs and deserves a legally secure placement which cannot be achieved without a grant of permanent custody to ACCS. This child's tender age requires successfully experienced care and parenting which cannot be provided by either parent. Angela West, sister of General Hoy West Sr., has offered to take placement of this infant. While her stated intentions are honorable and probably sincere, her own circumstances and family issues are too troublesome and challenging to risk such a placement. Among other things, Angela leaves her children in her brother's care"; (5) "R.C. 2151.414(E)(11) applies as to mother in that she has had her parental rights involuntarily terminated as to two other children."
 {¶ 21} The court also found that the child cannot and should not be placed with either parent within a reasonable time. The court explained:
"[B]oth mother and father are unemployed and receive disability benefits and food stamps for their own care and support. Father receives SSI and mother, a previous SSI recipient, is receiving disability income currently, while appealing a denial of SSI benefits.
Father demonstrates obvious significant cognitive and communicative limitations. The parties' emotional instability is a hallmark of their lives as they live from day to day in a condition of unabashed dependency.
[Father] spends his day playing his Play Station II and some times riding a bicycle. He has never held a job and acknowledges an anger problem. When he is angry he `beats on bicycles with a hammer.' When attempting to answer questions in court, father would often begin nodding his head either affirmatively or negatively or start answering questions well before the subject of the inquiry had been revealed.
[Father']s former spouse and mother of his only other child testified pursuant to subpoena. She portrayed [father] as a controlling person with a drinking problem. She reports verbal and physical abuse including being `knocked onto her couch while pregnant.' Though [father] has had no contact with their mutual son Ryan (d.o.b. 6-28-00) for over a year, she reported that when there were visits, her son would return dirty, would experience nightmares and would stick objects up his rectum. In his testimony, [father] was asked about his drinking problem. He stated that he stopped drinking. When asked how long that has been the case he replied `since the last time I talked to my attorney.' His attorney, of course, was sitting in the courtroom and had spoken with him only minutes before.
Anna Anderson also has inadequate education and training. She is usually on some form of disability benefits. One example of her cognitive limitations can be found in the testimony regarding efforts to feed the baby at supervised visitations. Anna and [father] were provided with a small plastic baby bottle and a pre-measured portion of powdered formula in a ziplock bag. They were told to empty the entire contents of the bag into the bottle and to fill the bottle completely with water. They repeatedly failed to get this right. The best the parents' attorneys could do in cross examination of the social worker was to establish that they were `making progress' with this task. Obviously, the challenges of acceptable parenting go well beyond this minimal requirement.
Anna Anderson has not taken advantage of any available counseling. Her son was placed in the emergency custody of ACCS in September of 2004 and she finally went to Tri-County Mental Health and Counseling on December 17, 2004, five days before the dispositional hearing, and signed up for an intake evaluation.
Regarding R.C. 2151.414(E)(11), mother involuntarily lost permanent custody of two other children through actions in this Court * * * *.
Regarding R.C. 2151.414(E)(16), the Court finds other relevant factors supporting the disposition of permanent custody. For all practical purposes, mother and father are now and will continue to be dependants of society. Both are unable or unwilling to provide for themselves. They are at the complete mercy of government programs and charitable organizations. While it is certainly possible for someone on disability assistance to be a reasonable parent, these two have demonstrated a [h]istory of irresponsibility and inadequate parenting. Putting this baby in harm's way is not required to further evidence this point."
 {¶ 22} The court also found that ACCS used reasonable efforts:
"While this child was removed directly from the hospital following birth, ACCS has provided visitation, parenting instruction, financial assistance * * * and general case management. The agency also has a much longer and more extensive history of reasonable efforts with mother and her previous children. In fact, the reasonable efforts were not required with respect to mother pursuant to R.C. 2151.419(A)(2)."
 {¶ 23} Thus, the trial court awarded ACCS permanent custody. Appellant timely appealed the trial court's judgment.
 I {¶ 24} In her first assignment of error, appellant contends that the guardian ad litem failed to comply with the R.C. 2151.218(I) duties by failing to fully investigate the child's situation. She asserts that a more thorough investigation by the guardian ad litem would have provided the trial court with additional information regarding the child's best interests. Appellant additionally complains that the guardian ad litem, and the court based their decisions upon two-year old information found in ACCS records from her prior case.
 {¶ 25} Initially, we note that at no point during the trial court proceedings did appellant raise an issue concerning the guardian ad litem's investigation or her role in the proceedings. Thus, appellant has waived the alleged error. See In re C.C., Cuyahoga App. No. 83793,2004-Ohio-5213; In re Coyne (Apr. 29, 1999), Cuyahoga App. Nos. 73798 
73799. We may, therefore, recognize the error only if it constitutes plain error. See In re Etter (1998), 134 Ohio App.3d 484, 492,731 N.E.2d 694. Courts should exercise extreme caution when invoking the plain error doctrine, especially in civil cases. Consequently, courts should limit applying the doctrine to cases "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *." Goldfuss v. Davidson (1997),79 Ohio St.3d 116, 122-123, 679 N.E.2d 1099. See, also, In re Alyssa C.153 Ohio App.3d 10, 17, 2003-Ohio-2673, 790 N.E.2d 803; In re Curry,
Washington App. No. 03CA51, 2004-Ohio-750. The case sub judice is not one of those exceptional cases in which the alleged error seriously affects the fairness of the proceedings.
 {¶ 26} R.C. 2151.281(I) provides that the guardian ad litem "shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child." The guardian ad litem's primary duty is to protect the child's interests. In re Myers, Athens App. No. 02CA50, 2003-Ohio-2776 (citing Juv.R. 4(B); R.C. 2151.281(B)(1)). Part of the guardian ad litem's duty is to investigate the child's situation and to ask the court to do what the guardian ad litem believes is in the child's best interest. Id. (citing In re Baby Girl Baxter (1985), 17 Ohio St.3d 229,232, 479 N.E.2d 257).
 {¶ 27} In the case at bar, we find no evidence in the record to suggest that the guardian ad litem failed to comply with her duty to investigate the child's best interests. The guardian ad litem stated that she visited the home into which appellant and West would bring the child and determined that it was inappropriate for the child and three adults. The guardian ad litem stated that she observed visitation between the parents and the child, met with the parents, and met the child and the child's foster mother. She reviewed ACCS records from appellant's prior involvement. Based on all of the above information, the guardian ad litem recommended that the trial court award ACCS permanent custody. We believe that the guardian ad litem sufficiently complied with the R.C. 2151.281(I) duties. See, generally, In re Andy-Jones, Franklin App. Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312. Moreover, appellant has not shown what other evidence the guardian ad litem could have discovered that may have affected her decision. Thus, she has not established any prejudice. See, generally, In re Seitz, Trumbull App. No. 2002-T-97, 2003-Ohio-5218 ("[I]t is not immediately apparent that a custodial disposition should be reversed on the basis of arguably ineffective service by the guardian ad litem.").
 {¶ 28} Additionally, the record does not support appellant's argument that the guardian ad litem or the trial court based their decisions entirely on two-year old information. Both the guardian ad litem and the court in reaching their decisions, as we explain more fully under appellant's second assignment of error, cited current conditions as well as the information from appellant's prior involvement with ACCS. Furthermore, nothing prohibits a court from basing a permanent custody decision upon a parent's past history with a children services agency. In fact, courts have recognized that a parent's past history is one of the best predictors of future behavior. See In re A.S., Butler App. Nos. CA2004-07-182 and CA2004-08-185, 2004-Ohio-6323 ("Past history is often the best predictor of future conduct. While surely people can change, the facts do not indicate that [the biological parents] have the motivation or ability to follow through and do what is necessary to regain custody of their child."); In re Vaughn (Dec. 6, 2000), Adams App. No. 00CA692 ("To further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct. Some of the most reliable evidence for the court to consider is the past history of the children and the parents."); see, also, In re Brown
(1989), 60 Ohio App.3d 136, 139, 573 N.E.2d 1217 (stating that the mother's "past parenting history and her ability to comply with prior reunification plans regarding her other children were relevant considerations in the juvenile court's dispositional determination to award a children services agency permanent custody).
 {¶ 29} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.
 II {¶ 30} In her second assignment of error, appellant claims, in essence, that the trial court's decision to award ACCS permanent custody of her newborn child is against the manifest weight of the evidence. She asserts that although she previously lost custody of two other children, she is now capable of appropriately caring for the newborn child. Appellant complains that ACCS based its permanent custody request upon her prior case history and not upon her current situation.
 {¶ 31} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. Santosky v. Kramer (1982),455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; In re Murray (1990),52 Ohio St.3d 155, 156, 556 N.E.2d 1169, 1171. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'"In re Cunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (quotingIn re R.J.C. (Fla.App. 1974), 300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands such termination.
 {¶ 32} Once a court adjudicates a child abused, neglected, or dependent, the court may commit the child to the permanent custody of a public children services agency after determining that the child cannot be placed with either of the child's parents within a reasonable time, in accordance with R.C. 2151.414(E), and that permanent custody is in the best interest of the child, in accordance with R.C. 2151.414(D). See R.C. 2151.353(A)(4).
 {¶ 33} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1).
 {¶ 34} When considering whether to grant a children services agency permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
(A) To provide for the care, protection, and mental and physical development of children * * *;
• * * *
(C) To achieve the foregoing purpose, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
R.C. 2151.01.
 {¶ 35} We note that clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
"The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
 {¶ 36} In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04,495 N.E.2d 23, 26; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71,74, 564 N.E.2d 54, 60. In reviewing whether the trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel,55 Ohio St.3d at 74. If the trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
 {¶ 37} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273:
 {¶ 38} "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger (1997),77 Ohio St.3d 415, 419, 674 N.E.2d 1159; see, also, In re Christian,
Athens App. No. 04CA10, 2004-Ohio-3146; In re C.W., Montgomery App. No. 20140, 2003-Ohio-2040.
 {¶ 39} R.C. 2151.414(B)(1)(a) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that:
The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 40} R.C. 2151.414(D) requires the trial court to consider specific factors in determining whether the child's best interests would be served by granting a children services agency permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[1]
 {¶ 41} R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with either parent within a reasonable time. See R.C. 2151.414(B)(1)(a). If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":
• * * *
(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
• * * *
(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child.
• * * *
(16) Any other factor the court considers relevant.
 {¶ 42} A trial court may base its decision that a child cannot or should not be placed with either parent within a reasonable time upon the existence of any one of the above factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time. See In re William S. (1996),75 Ohio St.3d 95, 661 N.E.2d 738; In re Hurlow (Sept. 21, 1998), Gallia App. No. 98 CA 6; In re Butcher (Apr. 10, 1991), Athens App. No. 1470.
 {¶ 43} In the case at bar, we find ample competent and credible evidence to support the trial court's decision to award ACCS permanent custody of the child. First, sufficient evidence supports the court's finding that the child cannot and should not be returned to either parent within a reasonable time. The evidence shows that appellant previously had her parental rights terminated with respect to two children. See R.C. 2151.414(E)(11). Furthermore, she no longer has custody of another child. Instead, a relative has custody of the child and appellant chooses not to visit the child. Appellant has not shown commitment to this child. See R.C. 2151.414(E)(16). Additionally, the evidence shows that appellant is either unable or unwilling to provide an adequate home for her child. Appellant does not have her own home, but instead lives in a small two-bedroom apartment with her paramour's mother. The guardian ad litem stated that the home is not appropriate for the parents, the child, and West's mother. Appellant could be employed so that she could support her child and perhaps afford a place of her own, but so far has not been willing to become employed. Appellant's deficiencies in parenting the two children that ACCS previously removed further demonstrates her inability or unwillingness to provide an adequate home for her child. See R.C. 2151.414(E)(4). Thus, we conclude that the record fully supports the trial court's finding that the child cannot and should not be placed with appellant.
 {¶ 44} The record also supports the trial court's finding that the child cannot and should not be placed with West. West, like appellant, is not employed and does not live independently. West lives with his mother, who has a long history with ACCS. West does not currently visit the son (Ryan) he has with Tonya West and has not shown any commitment toward him. When West did visit with Ryan, upon Ryan's return to his mother Ryan acted out problems and cleanliness issues. These are relevant factors that the court could conclude show that the child cannot and should not be placed with West within a reasonable time.
 {¶ 45} Second, the evidence supports the court's decision that awarding ACCS permanent custody would serve the child's best interests.
 {¶ 46} Regarding the first best interest factor, the child's interaction and interrelationships, the evidence shows that the child is not bonded to appellant, although this is understandable given that the child was removed from appellant's custody the day after his birth. The foster mother stated that the child appears bonded to her and that her children interact well with the newborn. The guardian ad litem testified that the child is doing well in foster care and that neither appellant nor West seemed able to understand the child's cues to address his needs. West stated that he was afraid to hold or bathe the child because he has weak arms. Appellant was unable to follow instructions to prepare the child's bottle for feeding.
 {¶ 47} With respect to the third factor, the child's custodial history, at the time of the permanent custody hearing, the child had been in ACCS's custody since birth, or about three months.
 {¶ 48} Regarding the fourth factor, the child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting permanent custody to the agency, the evidence shows that the newborn, like all children, not only needs but deserves a legally secure permanent placement. Appellant, West, or other relative placement would not provide the child with a legally secure permanent placement. Appellant previously demonstrated her inability to properly provide a secure and sanitary permanent home for children. The law does not require the court to grant her the opportunity to experiment with a newborn child's well-being when her past actions show that she would not be a capable parent. See In re Pieper Children (1993),85 Ohio App.3d 318, 325, 619 N.E.2d 1059, quoting In re Campbell
(1983), 13 Ohio App.3d 34, 36, 468 N.E.2d 93 ("`A juvenile court should not be forced to experiment with the health and safety of a newborn baby where the state can show, by clear and convincing evidence, that placing the child in such an environment would be threatening to the health and safety of that child.'"). Courts have recognized that:
"` * * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"
 {¶ 49} In re Bishop (1987), 36 Ohio App.3d 123, 126, 521 N.E.2d 838
(quoting In re East (1972), 32 Ohio Misc. 65, 69, 288 N.E.2d 343, 346). While a parent undeniably has certain rights concerning his or her child, the focus of a permanent custody hearing and decision is not the parent's rights but the child's best interests.
 {¶ 50} The fifth factor, whether R.C. 2151.414(E)(7) to (11) apply, also supports the trial court's decision that permanent custody would serve the child's best interests. As we previously noted, appellant had her parental rights involuntarily terminated with respect to two other children. Thus, R.C. 2151.414(E)(11) applies. Appellant's complaint that the trial court should not have considered her case history with ACCS is meritless. See A.S., supra; Vaughn, supra; Brown, supra.
 {¶ 51} Consequently, the trial court's judgment awarding ACCS permanent custody is not against the manifest weight of the evidence. Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.
Judgment Affirmed.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Harsha, J.: Concurs in Judgment Only McFarland, J.: Concurs in Judgment Opinion.
[1] R.C. 2151.414(E)(7) to (11) provide as follows:
(7) The parent has been convicted of or pleaded guilty to one of the following:
(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child.